UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                          Case No. 6:12-cr-263-Orl-37DAB

SERGEI KUSYAKOV

### GOVERNMENT'S SENTENCING MEMORANDUM

### I. STATEMENT OF FACTS

**A.   Procedural History and Guilty Plea Hearing**

1.   On October 10, 2012, the defendant, SERGEI KUSYAKOV, was indicted by a federal Grand Jury for conspiracy, in violation of 18 U.S.C. § 371, and four counts of wrongful disclosure of individually identifiable health information, in violation of 42 U.S.C. § 1320d-6(a) & (b)(3) 2243(a).  Doc. 15.

2.   On January 7, 2013, the defendant pled guilty to those five offenses without a plea agreement.  Doc. 38.

3.   In his plea colloquy, the defendant was advised of the elements of each offense.  Doc. 45-13-14.  With respect to the four violations of wrongful disclosure of individually identifiable health information, the defendant acknowledged that the United States had to prove beyond a reasonable doubt that the defendant "intended to sell, transfer, or use such individually identifiable health information for commercial advance, personal gain and malicious harm."  Doc. 45-13.  For each of the four violations that were charged in the Indictment, the defendant admitted that he intended on transferring or using the individually identifiable health information of

those Florida Hospital patients for commercial advantage, personal gain and malicious harm in that he intended on using that information to solicit business for a chiropractic clinic operated by him (Doc. 45-19-20)

> Court: Did you intend to transfer or use such individually identifiable health information of C.S., J.S., L.M. and J.D. for commercial advantage, personal gain and malicious harm in that you intended on using that information to solicit business for a chiropractic clinic operated by you?
>
> Defendant: Your Honor, I wasn't operating any chiropractic clinic. I was working as a manager. Am I understand the question right?
>
> Court: Well, the question is, at least as phrased here by the United States, asking whether or not you intended to transfer or use such individually identifiable health information –
>
> Defendant: Yes, sir.
>
> Court: -- of the people that I identified for commercial advantage, personal gain and malicious harm in that you intended on using that information to solicit business for a chiropractic clinic operated by you?
>
> Defendant: Yes, I did. Yes, sir.

4. As for the factual basis for the plea, the defendant acknowledged that he had reviewed the facts contained in the Government's Notice of Maximum Penalty (Doc. 37) with his counsel, that the defendant had no objection to "any of the factual statements contained in the factual basis that's attached to the Notice of Maximum Penalty," that the factual basis set forth what he did, and that he would not be able to "argue or contest the facts at the time of sentencing" if he did not object to them at his guilty plea (Doc. 45-15-17):

2

Court: Have you had an opportunity to review in detail the factual basis that was attached to the notice of maximum penalty that was prepared by the government's attorney?

Defendant: Yes, I did.

Court: All right. Have you reviewed that with Mr. Dale?

Defendant: Absolutely.

Court: All right. Do you have any objection to any of the factual statements that are contained in the factual basis that appears beginning on page four of the government's notice of maximum penalty?

Defendant: No, sir.

Court: The factual statement that's attached to the notice of maximum penalty is lengthy, and I'm not going to require the United States to recite it word for word into the record because of its length, but I want to make sure, Mr. Kusyakov, that I spend a minute talking to you about it because it's important that you understand that the information that's contained in this factual basis does a couple of things. One is it provides me with information to make a judgment as to whether or not there's a factual basis to accept your plea; and, secondly, it is used by the Probation Office as part of their Presentence Report preparation. So when time comes around for sentencing, if you have any objection to the factual statements that are contained in the factual basis that are attached to this Notice of Maximum Penalty, you need to tell me about those today, because you won't be heard to argue or contest the facts at the time of sentencing. Understood?

Defendant: Yes, sir.

Court: All right. So let me ask you again, have you had a chance to review the factual statements that are contained in the government's Notice of Maximum Penalty carefully?

Defendant: Yes, sir.

Court: And have you reviewed those with your lawyer?

Defendant: Yes, we did.

> Court: All right. Do you have any objection to any of the factual statements contained in the factual basis that's attached to the Notice of Maximum Penalty?
>
> Defendant: No, sir.
>
> Court: All right. With respect to the factual basis that's attached to the notice of maximum penalty, Mr. Kusyakov, is that what you did?
>
> Defendant: Yes, sir.
>
> Court: All right. Do you admit that the factual basis contains -- that all the elements that are contained in the factual basis that relate to you are true and correct?
>
> Defendant: Yes, sir.

**B.    Summary of Agreed Facts for Sentencing**[1]

5. At times relevant to this case, KUSYAKOV was involved in the operation of Metro Chiropractic and Wellness Center and City Lights Medical Center. Doc. 37-4. From January 2009 until August 2011, KUSYAKOV illegally received individually identifiable health information of patients of Florida Hospital who had been involved in motor vehicle accidents. KUSYAKOV received that information from two employees of Florida Hospital. The first was Dale Munroe II. Doc. 37-4-11. After Dale Munroe II was fired for an unrelated data breach, KUSYAKOV began receiving stolen information from Munroe's wife, Katrina Munroe. Doc. 37-13-15. In total, Florida Hospital has identified more than 12,000 patients whose individually identifiable health information was illegally accessed as part of this conspiracy and scheme. Doc. 37-8.

---

[1] The facts set forth in Part I.B are summarized from the Government's Notice of Maximum Penalty, which the defendant has acknowledged reflects what he did and to which the defendant has asserted no objections.

6. The Indictment sets forth four instances when Dale Munroe II exceeded his authorized access to Florida Hospital's computer system and obtained, without authorization, the individually identifiable health information of patients of Florida Hospital who had been involved in motor vehicle accidents.  Doc. 37-8-9. Some of those motor vehicle accident patients received a phone call within a couple of days to about one week after their visit to a Florida Hospital location from someone offering them a lawyer or chiropractor referral. Doc. 37-9.  The patients were called at a phone number that the patient had given to Florida Hospital personnel during registration.  Doc. 37–9.  The caller knew specifics about the motor vehicle accident and the patients' treatment at Florida Hospital.  Doc. 37-9.  In any case where the patient asked the caller how their information had been obtained, the caller either attempted to give an excuse that the information was public record (in fact, the information is not public record until 60 days after the accident, by Florida law), or the caller discontinued the phone call without any explanation.  Doc. 37–9.

7. A phone number used by one of the solicitors described above was found to have also been in contact with KUSYAKOV, who was the registered agent for multiple chiropractic clinics and an injury hotline in the central Florida area.  Doc. 37-9.  KUSYAKOV was associated with a "medical center" and an injury hotline and was identified as an individual who was known to have employed "runners" to gather people to participate in staged vehicle accidents for the purpose of having those participants seek treatment at KUSYAKOV's clinics and bill the participants' insurance companies for their treatment.  Doc. 37-10.

8. A review of Dale Munroe II's phone records showed the following pattern of regular and significant contact between Dale Munroe II and KUSYAKOV (Doc. 37-10-11):

    a. Dale Munroe II accessed a patient record and had telephonic contact through either a voice call or a text message with KUSYAKOV.

    b. KUSYAKOV had telephonic contact with another individual who ultimately contacted the patient to offer the patient a referral for a lawyer or a chiropractor. Typically, if a lawyer referral was offered, the lawyer would request that the patient see a chiropractor for diagnosis.

9. KUSYAKOV paid Dale Munroe II by check and by cash for the stolen patient information. Doc. 37-11. From the beginning of 2009 through January 2011, Dale Munroe II received $7,840 in cash that was deposited into his joint bank account, and $1,600.00 in checks that were deposited into his joint bank account. Doc. 37-12. Katrina Munroe received $1,200.00 in checks that were deposited into the joint bank account. Doc. 37-12. All of those checks and cash were paid by KUSYAKOV for providing the stolen patient information. Doc. 37-12.

10. KUSYAKOV knew that Dale Munroe II and Katrina Munroe were stealing individually identifiable health information from Florida Hospital patients to be provided to him, and KUSYAKOV received such stolen information for many different Florida Hospital patients. Doc. 37-15. In exchange for that information, KUSYAKOV paid Dale Munroe II. Doc. 37-15.

11. KUSYAKOV and the chiropractic clinics managed by him profited as a result of this conspiracy and scheme. Doc. 37-15. In particular, the chiropractic clinics managed by KUSYAKOV received business from some of the Florida Hospital patients whose individually identifiable health information had been stolen.

Doc. 37-15-16. The clinics managed by KUSYAKOV would never had received that business had KUSYAKOV not been involved in the theft and unauthorized use of those patients' individually identifiable health information. Doc. 37-16.

**C. <u>Additional Facts to Be Offered into Evidence at Sentencing</u>**

12. As noted above, the defendant has agreed that he and the chiropractic clinics managed by him profited as a result of this conspiracy and scheme. Federal agents have conducted an analysis of claims submitted to insurance companies for Florida Hospital patients whose individually identifiable health information had been stolen by Dale Munroe II or Katrina Munroe and provided to KUSYAKOV. To date, agents have identified over forty-five (45) claims that were submitted by KUSYAKOV's chiropractic clinics for Florida Hospital patients whose individually identifiable health information had been stolen and used without authorization to solicit them. The amount of those claims exceeds $325,000. Of that amount, KUSYAKOV's chiropractic clinics received over $177,000. KUSYAKOV's chiropractic clinics never would have received any of that business from any of those Florida Hospital patients had KUSYAKOV not been involved in the theft and unauthorized use of their individually identifiable health information.

13. Of the over forty-five (45) claims that were submitted by KUSYAKOV's chiropractic clinics for Florida Hospital patients whose individually identifiable health information had been stolen, the case agent has interviewed eleven (11) of those patients in an effort to confirm whether, absent being solicited, any of them would have gone to a chiropractor and, if so, any of them would have selected one of KUSYAKOV's clinics. The following is a summary of those results:

-- Two (2) of them would not have used a chiropractor had they not been solicited.

    --    Ten (10) of the eleven (11) patients would not have used any of the clinics operated by KUSYAKOV had they not been solicited. One patient stated that he had not begun doing any research as to which clinic to use, so he did not know if he would have used one of the defendant's clinics.

    --    Three (3) of them wanted to discontinue their treatment, but were pressured or advised to continue their treatment.

The total amount of claims that were submitted for these eleven (11) patients was over $130,000 (of the over $325,000 in claims that were submitted).

    14.    As has been disclosed to the defendant in discovery, Dale Munroe II was recruited by KUSYAKOV to participate in the conspiracy and scheme. KUSYAKOV was a volunteer at Florida Hospital. While working at the Celebration location, KUSYAKOV met Dale Munroe II and recruited him to participate in the conspiracy and scheme. On three separate occasions, KUSYAKOV asked Dale Munroe II for assistance with his business. Dale Munroe II did not agree to help until after the third request from KUSYAKOV. On that occasion, KUSYAKOV told Dale Munroe II that KUSYAKOV wanted him to get information about patients who had been involved in motor vehicle accidents or who had worker's compensation claims. It was only at that point that Dale Munroe II agreed to meet with KUSYAKOV to discuss the details. KUSYAKOV agreed to pay Dale Munroe II.

    15.    At first, Dale Munroe II conducted the scheme by writing down on paper the information for patients who had come into the hospital. KUSYAKOV was unhappy with the small number of patients that he was getting, so KUSYAKOV suggested to Dale Munroe II that Dale Munroe II use the computer system to search the patient records. KUSYAKOV also provided Dale Munroe II a cellular telephone to use to text the patient data to KUSYAKOV rather than providing it on paper. Over the course of the conspiracy and scheme, KUSYAKOV provided Dale Munroe II with

a total of four phones to use for this purpose. KUSYAKOV also coached Dale Munroe II on what to say if he were questioned by the police.

**D.    Defendant's Objections to the PSR**

16.    The Presentence Investigation Report ("PSR") recommends that the defendant's advisory offense level should be 25:

| | |
|---|---|
| U.S.S.G. § 2B1.1(a) | 6 |
| U.S.S.G. § 2B1.1(b)(G) | +12 |
| U.S.S.G. § 2B1.1(b)(2)(C) | + 6 |
| U.S.S.G. § 2B1.1(b)(16)(A) | + 2 |
| U.S.S.G. § 3B1.1 | + 2 |
| U.S.S.G. § 3E1.1 | - 3 |
| | 25 |

17.    The defendant has objected to the following upward adjustments: (1) the amount of loss (paragraph 30 of the PSR) and (2) the leadership adjustment (paragraph 33 of the PSR).

## II. ARGUMENT AND CITATION OF AUTHORITIES

**A.    The Amount of Loss is Between $200,000 to $400,000.**

According to the Addendum to the PSR, "[t]he defendant believes that there is no loss in this case." That is not true. In the Notice of Maximum Penalty filed by the United States, the following summary was provided regarding some of the impacts of the theft of the patient data (Doc. 37-15-16):

> KUSYAKOV and the chiropractic clinics managed by him profited as a result of this conspiracy and scheme. In particular, the chiropractic clinics managed by KUSYAKOV received business from some of the Florida Hospital patients whose individually identifiable health information had been stolen. The clinics managed by KUSYAKOV would never had received that business had KUSYAKOV not been involved in the theft and unauthorized use of those patients' individually identifiable health information.

At his change of plea hearing, the defendant was asked whether he had any objection to any of the facts set forth in the Government's Notice, which would include this paragraph. The defendant acknowledged that he had no objection to the statements identified above or to any of the others contained in the Notice and that the statements set forth in the Government's Notice of Maximum Penalty reflected what he did. Doc. 45-15-17. By acknowledging that he had no objection to any of the facts set forth in the Government's Notice, the defendant admitted to the facts set forth in that Notice, including the fact that he would not have received the business that he did had he not have been involved in the theft of the patient information.

Given the defendant's agreement to the facts set forth in the Notice, the United States respectfully submits that there are at least three categories of victims in this case who have suffered a loss.

First, the defendant's competitors suffered a loss. By stealing patient information, the defendant was able to obtain an advantage over his competitors that did not engage in fraud. As acknowledged in the Government's Notice, the theft of patient data gave the defendant business that he never would have received otherwise. Doc. 37-16. For those customers who would have needed chiropractic services, they would have gone to other chiropractors, which means that those chiropractors suffered pecuniary harm.

In many respects, this case is similar to a "kickback" scheme by which an individual uses a fraudulent method (i.e., paying a kickback) to get business that they would not have received otherwise. Under these circumstances, the United States respectfully submits that is appropriate to use the amounts that the defendant

and his businesses received, and attempted to receive, as the amounts that those chiropractors would have received or attempted to have received. See, e.g., United States v. Lamoreaux, 422 F.3d 750, 756 (8th Cir. 2005) ("Here, the district court found, as a matter of 'basic economics,' that the loss could be estimated by Lamoreaux's gain because the money he received from Albers Medical should have gone to Nucare. This finding is consistent with other kickback cases such as United States v. O'Malley, 364 F.3d 974, 979-80 (8th Cir. 2004)."); see also United States v. Yeager, 331 F.3d 1216, 1225 (11th Cir. 2003) (finding no "clear error for the district court to accept the profit made by Distributors through unrestricted sale of Atrovent during the time of the conspiracy as a reasonable estimate of the marginal value of the purloined right"). In other words, the money that the defendant and his businesses received for the patients whose information was stolen should have gone to others, which makes that amount, plus the amount of attempted claims that were not paid, the amount of loss in the case.

The following are two alternative ways to calculate loss in this case.

A second set of victims are insurance companies. As acknowledged in the "Factual Basis" in the Government's Notice of Maximum Penalty, KUSYAKOV was associated with a "medical center" and an injury hotline and is an individual who is known to have employed "runners" to gather people to participate in staged vehicle accidents for the purpose of having those participants seek treatment at KUSYAKOV's clinics and bill the participants' insurance companies for their treatment. Doc. 37-10. By stealing patient data, the defendant was also able to defraud insurance companies by getting patients for his chiropractic business who otherwise would not have used any chiropractor whatsoever. The end result was

that the insurance companies that paid claims for those customers never would have paid anything had the defendant not stolen and used the patient data. For the insurance companies that paid out claims under this scenario, the amount of claims that they paid, and the amount of claims that were submitted by the defendant and his businesses, reflect the amount of actual and intended loss in this case.

The third set of victims were the patients whose personal information was stolen. As was set forth in the Government's Notice, "Florida Hospital has identified more than 12,000 patients whose individually identifiable health information was illegally accessed." Doc. 37-8. For those victims, it was reasonably foreseeable to the defendant that those victims, upon learning of the theft of their information, would possibly seek to take steps to resolve any damage, or possible damage, to their credit. Such costs can be included in the determination of loss. <u>See, e.g.</u>, <u>United States v. Pham</u>, 545 F.3d 712, 722 (9th Cir. 2008) (holding that "costs associated with resolving disputed account activity, canceling credit cards and initiating fraud investigations with credit reporting agencies are also 'reasonably foreseeable' consequences of identity theft" and that "financial costs to bank account holders that are incurred in the course of resolving damage done to those accounts by a fraud scheme may be included in the calculation of actual loss under § 2B1.1(b)(1)"). The difficulty in this case is determining which of the over 12,000 victims suffered these type of losses, which makes the amount of money requested, and received, by the defendant and his businesses an appropriate measure of loss. <u>See generally</u> U.S.S.G. § 2B1.1 app. note 3(B) (providing that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss <u>but it reasonably cannot be determined</u>") (emphasis added).

In sum, there are three different theories by which loss can be determined in this case. Each of those theories results in an amount of loss between $200,000 and $400,000.

**B.      The Defendant Was an Organizer, Leader, Manager or Supervisor of Criminal Activity.**

The defendant should receive a leadership enhancement pursuant to U.S.S.G. § 3B1.1(c). "In distinguishing a leadership role, the district court should consider 'the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.'" United States v. Phillips, 287 F.3d 1053, 1058 (11th Cir. 2002) (quoting U.S.S.G. § 3B1.1 app. n. 4). Each of these factors is focused on sorting out the "relative responsibility" of the participants in an offense. U.S.S.G. § 3B1.1, background.

An upward adjustment pursuant to U.S.S.G. § 3B1.1 can be applied even where less than all of the factors are present. See United States v. Fones, 51 F.3d 663, 665-66 (7th Cir. 1995) (stating that "this court has upheld a § 3B1.1 increase where less than all factors are present"). In fact, "[t]he assertion of control or influence over only one individual is sufficient to support the role enhancement." United States v. Mandhai, 375 F.3d 1243, 1248 (11th Cir. 2004); see also United States v. Talisov, 339 Fed. Appx. 920, 925 (11th Cir. 2009) ("We have described the threshold requirement for imposing the § 3B1.1(c) role enhancement as a finding that the defendant had the requisite 'control' or 'influence' over another participant in the criminal activity.") (citations omitted).

13

In this case, a review of the pertinent factors establishes that the defendant should receive a two-level upward adjustment pursuant to U.S.S.G. § 3B1.1(c). In particular, the defendant was the one who organized the offense, recruited his main accomplice, and directed and controlled the participation of his main accomplice and others to ensure that the crimes were committed successfully. The defendant's leadership role is further demonstrated by the fact that the defendant directed Dale Munroe II on the specifics of how to steal the patient data and transmit it to him, as well as the relatively small share of the proceeds that the defendant's accomplices received when compared to the total amount of fraudulently obtained proceeds.

In other cases, courts have assessed a role enhancement under U.S.S.G. § 3B1.1 for defendants, such as the one in this case, who were responsible for the success of a criminal enterprise or who were actively involved in recruiting another conspirator and directing that conspirator's participation in the offense. See, e.g., United States v. Perry, 340 F.3d 1216, 1217-18 (11th Cir. 2003) (finding no clear error in assessment of two-level aggravated role enhancement where the defendant actively recruited two other individuals to transport drugs, arranged one of the recruited individuals to transport cocaine, directly paid one of those individuals, and was paid for his recruitment and supervision of others); United States v. Jones, 933 F.2d 1541, 1546-47 (11th Cir. 1991) (affirming aggravated role enhancement where, among other things, a defendant "made unilateral decisions regarding landing and loading locations and the time of such [drug] trips" and, through his involvement, demonstrated that he "had the responsibility of ensuring that the contemplated smuggling venture would suc-ceed").

14

The result should be in the same in this case. See, e.g., Talisov, 339 Fed. Appx. at 926 (stating that a role enhancement requires "'[n]othing more' than evidence that the defendant (1) recruited a participant in the crime, (2) prompted the participant to perform illegal conduct in preparation for the crime, and (3) briefed the participant on how to execute the crime") (citations omitted); Mandhai, 375 F.3d at 1248 ("Mandhai recruited Shuyeb Jokhan into the plot, prompted him to purchase weapons, and briefed him on the bombing plan. Nothing more was required.").

### III. CONCLUSION

Based upon the foregoing, the United States respectfully requests that the Court overrule the defendant's objections.

        Respectfully submitted,

        ROBERT E. O'NEILL
        United States Attorney

By:   *s/ Roger B. Handberg*
      Roger B. Handberg
      Assistant United States Attorney
      Florida Bar No. 0241570
      501 West Church Street, Suite 300
      Orlando, Florida 32805
      Telephone: (407) 648-7500
      Facsimile: (407) 648-7643
      E-mail: Roger.Handberg@usdoj.gov

**U.S. v. SERGEI KUSYAKOV**                              Case No. 6:12-cr-263-Orl-37DAB

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Thomas H. Dale

By:   *s/ Roger B. Handberg*
Roger B. Handberg
Assistant United States Attorney
Florida Bar No. 0241570
501 West Church Street, Suite 300
Orlando, Florida  32805
Telephone:   (407) 648-7500
Facsimile:    (407) 648-7643
E-mail:  Roger.Handberg@usdoj.gov